**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**JUANITA JOHNSON,**
**on behalf of D.J., a minor,**

             **Plaintiff,**

**v.**                                   **Civil Action No. 4:19-cv-7**

**ANDREW SAUL,**
**Commissioner of Social Security,[1]**

             **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Juanita Johnson, proceeding pro se on behalf of her minor son, D.J., seeks judicial review of the Commissioner of Social Security's (Commissioner) decision denying her son's claim for Supplemental Security Income (SSI) benefits under the Social Security Act. Johnson does not identify a specific aspect of the Administrative Law Judge's (ALJ) decision with which she disagrees, but in her Complaint, she "ask[s] for another opinion." Compl. 5 (ECF No. 3). Johnson and the Commissioner each move for summary judgment. (ECF Nos. 12, 15.) This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure. This report concludes that the ALJ did not err in denying SSI benefits and thus recommends that the final decision of the Commissioner be affirmed.

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019, and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). See also 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

## I. Procedural Background

Johnson protectively filed an application for SSI benefits on behalf of her minor son, D.J., on July 17, 2015, alleging disability since his birth on February 14, 2011. (R. at 116, 128, 196, 206.) The Commissioner denied the claim initially on October 5, 2015, (R. at 116-26), and again upon reconsideration on December 30, 2015, (R. at 128-138). Johnson requested an administrative hearing before an ALJ, which took place on October 12, 2017. (R. at 74-96.) Johnson appeared at the hearing pro se, waiving her right to representation. (R. at 77, 193.)

In a written opinion issued on May 1, 2018, the ALJ determined that D.J. was not disabled within the meaning of the Social Security Act and denied his claim for SSI benefits. (R. at 22-36.) On November 19, 2018, the Appeals Council denied Johnson's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-4.) Johnson timely filed this action on behalf of D.J., seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). This case is now before the court to resolve the parties' cross-motions for summary judgment.

## II. Factual Background

### A.    Previous SSI Application

Since his premature birth on February 14, 2011, D.J. has suffered from a number of medical conditions that have made life difficult for him and his mother. (R. at 82-83, 85-88, 90-92, 196, 237.) D.J., one of a set of twins, was born with craniosynostosis, a condition whereby portions of the skull prematurely fuse together, resulting in an abnormally shaped head. (R. at 79, 85-86, 103, 374, 380, 440, 453); Stedman's Medical Dictionary (27th ed. 2000). According to Johnson, to

2

permit the growth of his brain, D.J. required surgery at six months' old.  (R. at 86.)  In addition, D.J. suffered from nystagmus[2] and obstructive sleep apnea.  (R. at 103, 105, 119, 288.)

In light of these impairments, Johnson protectively filed an application for SSI benefits on behalf of D.J. on April 29, 2011.  (R. at 100, 117, 129.)  An ALJ issued a written opinion on March 29, 2013, finding that D.J.'s impairments, though severe, did not meet, medically equal, or functionally equal a listed impairment.  (R. at 97-115.)  Johnson did not appeal the ALJ's decision.  (R. at 117, 129, 212.)

**B.    Evidence for Current SSI Application**

1.    <u>Physical Impairments</u>

In this application, Johnson claims disability on account of D.J.'s reported chronic asthma.[3]  (R. at 116, 128, 206.)   Although it is not clear when D.J. developed asthma,[4] the record demonstrates that he received treatment for it and related pneumonia, bronchitis, and cough on several occasions between 2014 and 2017.  (R. at 373, 383-84, 398-401, 407, 419, 426, 437-41, 452, 456-57, 461-62, 464, 558, 674, 680, 685-86, 688, 690-91.)  In 2015, Johnson completed two function reports, dated August 11 and November 16, relating to D.J.'s physical impairments.  (R. at 80-82, 85, 220, 266-68, 620-23.)  In the first function report, Johnson reported that D.J.'s impairments did not affect his physical abilities or his ability to take care of his personal needs.  (R. at 219-20.)  But in the second report, Johnson reported that D.J.'s asthma prevents him from

---

[2] Nystagmus is defined as "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component."  <u>Stedman's Medical Dictionary</u> (27th ed. 2000).

[3] Although Johnson listed only chronic asthma as D.J.'s disabling condition in the SSI paperwork, (R. at 116, 128, 206), as illustrated below, Johnson also submitted evidence related to D.J.'s craniosynostosis as well as a great deal of evidence related to cognitive impairments unrelated to D.J.'s asthma.  In determining whether D.J. was disabled under Social Security regulations, the Commissioner considered this evidence and the corresponding listings.

[4] From the record, it appears that D.J. developed asthma as early as 2014 as treatment notes from December 2014 state that D.J. had a "history" of asthma.  (R. at 416.)

playing outside; that he gets headaches frequently; and that he gets pneumonia at least once or twice a month. (R. at 266-68.) In addition, in 2017, Johnson completed a daily activity survey on behalf of D.J. (R. at 620-23.) Johnson reported that D.J.'s severe asthma prevents him from doing "extreme active sports or lots of running." (R. at 620-21.) Finally, Johnson testified at the ALJ hearing that D.J. required asthma medication before engaging in any physical activity. (R. at 82-84.)

Although D.J. had prescription asthma medication, treatment notes reflect that D.J. did not take it as regularly as needed. In August 2015, Stephen Bolduc, M.D., noted that D.J. did not take his asthma medication daily and that D.J.'s condition suggested overall poor compliance with his medication regimen. (R. 373.) Moreover, in October 2015, Marilyn A. Gowen, M.D., recorded that Johnson informed her that D.J. did not like taking his asthma medication and that, as a result, she only gave him one of his two prescribed medications. (R. at 437.) Dr. Gowen "strongly recommended" to Johnson that D.J. take all of his asthma medication "whether he likes it or not," believing that compliance would improve his lung function. (R. at 437.) Lastly, in April 2017, Lori Goodwin, M.D., noted that D.J. had "not been following the plan" with respect to his asthma medication. (R. at 690-91.) Dr. Goodwin spoke at length with Johnson regarding the importance of D.J. regularly taking his asthma medication, explaining that "most children [with asthma] should be able to lead a normal life without a lot of limitations" by taking asthma medication regularly. (R. at 690.) In fact, the record indicates that when D.J. took his asthma medication as directed, his asthmatic symptoms were generally well-controlled. (R. at 373, 440, 692.)

Regarding D.J.'s craniosynostosis, in the summer of 2017, doctors performed a status post craniofacial reconstruction exam to evaluate D.J.'s craniosynostosis, at which time D.J. complained of frequent headaches and slight vision impairments. (R. at 321, 636-42.) Imaging of

4

the brain revealed Chiari I malformation but showed no evidence of syrinx.[5]  (R. at 636-42.)  The following September, D.J. underwent additional cranial surgery for the placement of an intercranial pressure (ICP) monitor, which was successful.  (R. at 87, 330-33, 658.)  According to Johnson's testimony, D.J. will require further surgery in the future – though it is not clear from the hearing transcript whether the surgery relates to his head or his neck – and must attend yearly checkups with a craniofacial surgeon for the rest of his life.  (R. at 86-87.)

2.   Cognitive Impairments

In addition to physical impairments, Johnson produced evidence, medical and non-medical, that D.J. developed behavioral and attention issues at school and at home.  In fall 2015, D.J.'s pre-kindergarten teacher, Christine Choate, completed a questionnaire regarding D.J.'s performance in the classroom.  (R. at 223-33; see R. at 276.)  Ms. Choate noted that D.J. had a "very serious problem" with paying attention; changing from one activity to another without being disruptive; working without distracting others; expressing anger appropriately; following rules and obeying authority; handling frustration appropriately; using good judgment regarding personal safety and dangerous circumstances; and identifying and appropriately asserting emotional needs. (R. at 225-229.)  She also reported that D.J. had a serious problem applying problem solving skills in class discussions; refocusing to task when necessary; being patient when necessary; and using appropriate coping skills to meet daily demands of school environment.  (R. at 224-26, 229.)  However, Ms. Choate opined that D.J. had little to no problem understanding school and content vocabulary; understanding and participating in class discussions; learning new material; focusing long enough to finish assigned activities or tasks; working at a reasonable pace/finishing on time;

---

[5] A syrinx is a "pathologic tubular cavity in the brain or spinal cord."  Stedman's Medical Dictionary (27th ed. 2000).

5

using language appropriate to the situation and listener; moving about and manipulating objects; and caring for his physical needs. (R. at 224-28.) She also noted that she had to remind D.J. about the appropriateness of his behavior several times during the day and that he gets angry if he "doesn't get his way." (R. at 226-27.) As a result, D.J. began working with a school psychologist and counselor. (R. at 226, 651.) In addition, Ms. Choate began using a behavior chart to encourage good behavior. (R. at 276.) The chart helped some but did not prevent future incidents. (R. at 276-77.)

The school's Child Study Committee referred D.J. to the Hampton-Newport News Community Services Board (HNNCSB) for Therapeutic Day Treatment (TDT) in October 2015. (R. at 274-77.) The Virginia Independent Clinical Assessment Program performed an evaluation of D.J. and concluded that D.J.'s condition warranted TDT. (R. at 650-51.) Accordingly, a counselor began working with D.J. in class regularly at least until the end of 2017. (R. at 732-1372.) Although the HNNCSB notes document incidents of poor and defiant behavior, including a one-day suspension for hitting a teacher, (see, e.g., R. at 346-50, 758, 825, 871-72, 941, 985, 995, 1164, 1227, 1285, 1301, 1304, 1360), they also demonstrate some improvement in D.J.'s conduct, (see, e.g., R. at 739, 758, 769, 831, 856, 925, 995, 1039, 1124, 1158, 1237, 1290, 1321, 1358).

In kindergarten (2016 to 2017), D.J. appeared to progress somewhat academically. For all four "marking periods" of the year, D.J. received mostly satisfactory scores and some progressing scores. (R. at 335, 624.) D.J.'s teacher, Kim Vinson, noted in the third marking period that D.J. had made progress toward his year-end goals, and she noted in the fourth marking period that D.J. had "made many accomplishments" and "gr[e]w academically." (R. at 335-336, 624-625.) However, the summer following D.J.'s kindergarten year, Ms. Vinson completed a questionnaire

6

regarding D.J.'s performance in the classroom that demonstrated that D.J. still had a lot to work on. (R. at 310-20.) Specifically, Ms. Vinson expressed that D.J. had a serious problem expressing ideas in written form; applying problem-solving skills in class discussions; paying attention; completing homework assignments; expressing anger appropriately; respecting authority; and knowing when to ask for help. (R. at 313-15, 317.) She indicated that D.J. needed one-on-one support in writing and worked best with a partner that he wants. (R. at 313, 315.) Ms. Vinson also reported that D.J. had an obvious problem comprehending oral instructions; reading and comprehending written material; comprehending and doing math problems; recalling and applying previously learned material; refocusing to task when necessary; playing cooperatively with other children; following rules; and exhibiting patience. (R. at 313-15, 317.) However, she found that D.J. had little to no problem understanding school and content vocabulary; learning new material; sustaining attention during play/sports activities; focusing long enough to finish assigned activities or tasks; using language appropriate to the situation and listener; using adequate vocabulary and grammar to express thoughts and ideas in general conversation; caring for physical needs; and using good judgment regarding personal safety and dangerous circumstances. (R. at 313-15, 317.)

Ms. Vinson completed a "Teacher's Report Form." (R. at 626-29.) She reported that D.J. performed somewhat below grade in reading and writing and at grade level in math, science, and social studies. (R. at 626.) She noted that, compared to the average pupil, D.J. was somewhat less hard working, somewhat less behaving appropriately, slightly less happy, and about average in how much he was learning. (R. at 627.) She found it very true or often true that D.J. argues a lot; fails to finish things he starts; cries a lot; destroys his and others' property; has difficulty following directions; disturbs other pupils; does not get along with other pupils; is overtired;[6] has headaches;

---

[6] Ms. Vinson later wrote that D.J was "very tired all the time." (R. at 628.)

is apathetic or unmotivated; has poor school work; is poorly coordinated or clumsy; refuses to talk; is easily frustrated; is inattentive or easily distracted; and is underactive, slow moving, or lacks energy. (R. at 628-29.)

In order to further D.J.'s development, in 2018, his first-grade teacher, Jessica Dupuis, created a Section 504 accommodation plan. (R. at 358-61.) Ms. Dupuis noted that D.J. required extended time with assessments and often required modified assessments "as he has difficulty remaining focus for a period time and becomes easily tired." (R. at 358.) In addition, she noted that although he performed well in math, he had difficulty with following directions and "can become frustrated." (R. at 358.) Ms. Dupuis also recorded that the use of "if thens" had proved effective. (R. at 358.)

In addition to school records, Johnson completed two function reports and a daily activity survey, which are referenced above, that touch upon D.J.'s cognitive limitations. In the 2015 function reports, Johnson reported that D.J.'s impairments did not limit his progress in understanding and using what he has learned. (R. at 214-21; 261-65.) In addition, in the first function report, Johnson reported that D.J.'s impairments did not affect his behavior with other people or his ability to take care of his personal needs. (R. at 219-20.) But three months later, Johnson reported the contrary. (R. at 266-67.) Specifically, Johnson noted that D.J. does not play well with others and tends to act aggressively. (R. at 266-68.) In the 2017 daily activity survey, she stated that D.J. has problems with reading, spelling, writing, and math. (R. at 620.) And she reported that D.J. often gets angry, frustrated, emotional, sad, depressed, and aggressive; has trouble following directions at home and at school; has trouble sleeping; and has attention issues. (R. at 620-23.)

Aside from the function reports and daily activity survey, Johnson also testified at the ALJ hearing that D.J. exhibits disruptive behavior and an inability to focus on tasks or activities for extended amounts of time, both at school and at home. (R. at 80-82, 85.) Specifically, she testified that in pre-kindergarten, D.J. "had problems staying in classrooms, sitting still, [and] listening," and that he was very defiant and would hit others. (R. at 80-81.) She also stated that, although D.J. currently worked with a "special teacher," he was below grade-level in reading and writing and had difficulty doing his homework and maintaining good grades. (R. at 81.) D.J.'s grandmother also testified at the ALJ hearing regarding D.J.'s behavior, noting that "if you don't let [D.J.] do what he wants to do, he gets very angry." (R. at 92.)

The record also contains medical evidence related to D.J.'s behavior. In August 2015, Johnson reported to Dr. Bolduc that D.J. threatened to kill his twin brother. (R. at 378.) In response, Dr. Bolduc referred D.J. to psychiatrist Peter M. Dozier, M.D., for a psychiatric consultation. (R. at 378.) D.J. treated with Dr. Dozier the following September and November. (R. at 569-77.) Although Dr. Dozier recorded that D.J. behaved socially appropriate for his age, he diagnosed D.J. with oppositional defiant disorder (ODD). (R. at 569-70, 572-74.) However, based on his observations, Dr. Dozier did not believe that D.J. required psychiatric intervention or medication. (R. at 570, 573.)

In October 2017, Rajeev Srivastava, M.D., performed a child crisis psychiatric evaluation of D.J. (R. at 1341-43.) Dr. Srivastava noted that D.J. was alert and had coherent thought processes and appropriate thought content, but the doctor also observed that D.J. had an anxious mood and impaired judgment about his actions and behavior. (R. at 1342.) The treatment notes also indicate that D.J. was undergoing outpatient therapy with a Dr. Cook of Clinical Associates of Tidewater. (R. at 1341.) Dr. Srivastava diagnosed D.J. with ODD, attention deficit

hyperactivity disorder (ADHD), and anxiety disorder. (R. at 1342.) Dr. Srivastava prescribed D.J. a low dose of Zoloft to help control his anxiety, (R. at 1342), and later prescribed Clonidine to help him calm down at nighttime and fall asleep, (R. at 1365).

3.      State Agency and Interrogatory Medical Evidence

The record contains the opinions of state agency medical consultants regarding D.J.'s impairments.  In October 2015, Joseph Familant, M.D., and Stephen Saxby, Ph.D., determined that D.J.'s impairments were not severe enough to render him disabled under the Social Security Act. (R. at 116-26.)  Dr. Familiant noted that "[w]hile [D.J.'s] impairments are documented and cause some limitations in functioning, the evidence shows the child's condition responds to treatment, structure and guidance. . . .  Overall, the child is capable of performing in an age-appropriate manner." (R. at 123.)  He also determined that "the severity of the symptoms and the alleged effect on function are not entirely consistent with the total medical and non-medical evidence." (R. at 123.)  At the reconsideration level, Joseph Duckwall, M.D., and Daniel Walter, Psy.D., L.C.P., expressed the same opinion of no disability. (R. at 128-38.)  Lastly, before issuing his decision, the ALJ sought an opinion from C.R. Block, M.D. (R. at 28, 1375-81.)  Dr. Block likewise found that D.J. did not meet the criteria for disability. (R. at 1375-81.)

C.      **Evidence Submitted After the ALJ's Decision**

In seeking review by the Appeals Council, Johnson submitted additional evidence. (R. at 7-8, 11-18, 42-73.)  This evidence includes documentation of approved requests for leave under the Family Medical Leave Act (FMLA) from her employer, dated July 24, 2018, (R. at 7-8); the corresponding applications for FMLA leave, dated April and May 2018, (R. at 11-18); a report of diagnostic testing for memory from McIntosh Elementary School, dated April 24, 2018, (R. at 42-43); a child study action plan report from Newport News Public Schools, dated May 31, 2018, (R.

at 44-47); documentation requesting permission for student services from Newport News Public Schools, dated March 22, 2018, (R. at 48); a speech, language and literacy evaluation report from the Children's Hospital of The King's Daughters, dated April 2, 2018, (R. at 49-50); a Woodcock Reading Mastery Tests summary report, dated April 2, 2018, (R. at 51-55); documentation of future medical appointments from Children's Health Sys-Live, dated April 9, 2018, (R. at 56-61); three ADHD rating scale questionnaires from the Hampton Newport News Community Services Board, dated March 27, 2018, and April 20, 2018, (R. at 62-64); and duplicates of the Section 504 forms referenced above, dated February 9, 2018, (R. at 65-73; 358-66). The Appeals Council considered this evidence and concluded that it was either not relevant or did not result in a reasonable probability that it would change the outcome of the ALJ's decision. (R. at 2.)

Furthermore, in pursuing summary judgment in this action, Johnson submitted additional evidence – a twelve-page evaluation report from Children's Specialty Group, PLLC. (ECF No. 14.) The report is based off three visits between January and April 2019. (ECF No. 14, at 1.) The undersigned addresses this evidence below.

### III. Legal Standard

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence in the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S 389, 401 (1971) (quoting Consl. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla"

of evidence but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. Recommended Conclusions of Law

For a claimant under the age of eighteen to qualify for SSI under title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., he must be disabled due to a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); see also 20 C.F.R. § 416.906. To determine whether a child is disabled under the regulations, Social Security regulations set out a three-step sequential analysis. 20 C.F.R. § 416.924. First, the ALJ asks whether the claimant is engaging in substantial gainful activity. § 416.924(b). If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has any severe medically determinable impairments. § 416.924(c). If he does not, the claimant is not disabled. If he does, the ALJ proceeds to the final step and determines whether any of the claimant's impairments meet,

medically equal, or functionally equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B (a "listed impairment"). § 416.924(d). In making this determination, the ALJ must consider the combined effect of all of the claimant's impairments, regardless of their severity. §§ 416.923(c); 416.924a(b)(4); 416.926a(a), (c). If the claimant's impairments meet, medically equal, or functionally equal a listed impairment, he is disabled and entitled to benefits. Otherwise, the claimant is not disabled.

To meet a listed impairment, the claimant's impairments must satisfy the criteria of a particular listed impairment. § 416.925(c)(3). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant's impairments medically equal the criteria of a listed impairment if they are "at least equal in severity and duration to the criteria of any listed impairment." § 416.926(a).

In determining the functional equivalence of a child's impairments to any listed impairments, the ALJ evaluates the child's ability to function in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. § 416.926a(b)(1). To be considered disabled under this functional approach, the claimant must have either "marked" limitation in two domains or "extreme" limitation in one domain. § 416.926a(a). A claimant has "marked" limitation in a domain when the claimant's impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2)(i). A claimant has "extreme" limitation in a domain when the claimant's impairment or combination of impairments interferes very seriously with his ability to independently initiate, sustain, or complete activities. § 416.926a(e)(3)(i).

13

When deciding the extent of the claimant's functional limitations, the ALJ must compare "how appropriately, effectively, and independently [the claimant] performs activities compared to the performance of other children [of the same] age who do not have impairments." § 416.926(b). To guide the ALJ's analysis in this respect, for the first five domains, the regulations provide domain-specific examples of the traits and skills that a typical-functioning child within a specific age-range[7] should possess. See § 416.926a(g)-(l). The regulations then list a number of examples for each domain that, if applicable to the claimant, might suggest limited functioning in that domain. E.g., § 416.926a(g)(3)(ii) (stating that a claimant who "cannot rhyme words or the sounds in words" may have limited functioning in acquiring and using information). However, the fact that an example accurately describes the claimant does not necessarily reflect marked or extreme limitation in that domain as the claimant's age and developmental stage are also important factors in determining the claimant's level of functioning. E.g., § 416.926a(g)(3) (noting that "an example . . . may describe a limitation in an older child, but not a limitation in a younger one").

A.     **The ALJ's Decision**

In this case, the ALJ issued a written opinion, finding that D.J. did not qualify as disabled under the Social Security Act. (R. at 22-36.) In arriving at this conclusion, the ALJ employed the three-step analysis set out above. At step one, the ALJ found that D.J. had not engaged in gainful activity since the protective filing date, July 17, 2015. (R. at 26.) At step two, the ALJ concluded that D.J. had the following severe impairments: asthma, craniosynostosis, ODD, and ADHD. (R. at 26.) At the third step, the ALJ first determined that D.J. did not have an impairment or

---

[7] The regulations establish five classes of minors based on age: (1) newborns and infants (birth to attainment of age 1); (2) older infants and toddlers (age 1 to attainment of age 3); (3) preschool children (age 3 to attainment of age 6); (4) school-age children (age 6 to attainment of age 12); and (5) adolescents (age 12 to attainment of age 18). E.g., § 416.926a(g)(2).

combination of impairments that met or medically equaled the severity of a listed impairment. (R. at 26.) In so concluding, the ALJ considered the following listed impairments: 103.03 (asthma), 112.02 (neurocognitive disorders), 112.08 (personality and impulse-control disorders), and 112.11 (neurodevelopmental disorders). (R. at 26); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 103.03, 112.02, 112.08, 112.11.

Before considering whether D.J.'s impairments functionally equaled any of the listed impairments, the ALJ noted that between the date of the application in 2015 and the date of the ALJ's decision in 2018, D.J. had moved from preschool classification to school-age classification. (R. at 26); see, e.g., § 416.926a(g)(2). Accordingly, for each of the first five domains, the ALJ discussed the traits and skills a typical-functioning child should possess, as provided by the regulations, in both the preschool category and the school-age category. (R. at 29-34.) In addition, the ALJ listed the examples demonstrating limited functioning, as provided by the regulations, for all six domains. (R. at 29-35.) Finally, after considering the above and D.J.'s impairments, the ALJ concluded that D.J. had less than marked limitation in each of the six domains, resulting in a finding of no disability. (R. at 29-36.)

In arriving at this conclusion, the ALJ gave moderate weight to the opinions of the state agency medical consultants, which concluded that D.J. had no limitation in the first domain (acquiring and using information) and the fourth domain (moving about and manipulating objects) and less than marked limitation in the other four domains. (R. at 28-29, 121-22, 134-35.) According to the ALJ, the record "demonstrate[s] some limitation in the claimant's ability to acquire information and move about. (R. at 29.) In addition, the ALJ gave substantial weight to Dr. Block's opinion, which found that D.J. had no limitation in the fourth domain and less than marked in the other five domains. (R. at 28, 1379-80.) Although the ALJ noted that "the objective

record sufficiently supports most of [Dr. Block's] evaluation, the ALJ, as with the state agency consultants' opinion, disagreed with respect to the finding of no limitation in moving and manipulating objects. (R. at 28.)

**B.    Substantial Evidence in the Record Supports the ALJ's Finding of No Disability**

Because Johnson proceeds pro se, the court must liberally construe her pleadings. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); see also Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Here, Johnson has not raised any specific objections to the ALJ's decision. Accordingly, the undersigned construes her pleadings as challenging the ALJ's decision as not being supported by substantial evidence. See McAlister v. Colvin, No. 1:12-3363, 2014 WL 2526896, at *7 (D.S.C. June 4, 2014) (adopting magistrate judge's report and recommendation). However, the undersigned notes that liberal construction "does not require courts to construct arguments or theories for a pro se plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Miller v. Jack, No. 1:06-cv-64, 2007 WL 2050409, at *3 (N.D.W. Va. July 12, 2007) (citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)); see also Beaudett v. City of Hampton, 775 F.2d 1274, 1276 (4th Cir. 1985) (observing that although pro se litigants "cannot . . . be expected to frame legal issues with the clarity and precision" of lawyers, district courts are not "required to conjure up and decide issues never fairly presented to them").

After considering the ALJ's opinion and the record as a whole, the undersigned concludes that the record contains substantial evidence supporting the ALJ's decision that none of D.J.'s impairments met or medically equaled any listed impairments. Here, the ALJ's opinion identified four listings in relation to D.J.'s impairments: 103.03 (asthma), 112.02 (neurocognitive disorders), 112.08 (personality and impulse-control disorders), and 112.11 (neurodevelopmental disorders).

16

(R. at 26); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 103.03, 112.02, 112.08, 112.11.  To satisfy the criteria for listing 103.03, the child's asthma must cause "exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart," and "[e]ach hospitalization must last at least 48 hours." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03.

With respect to listing 112.02, the regulations provide the following criteria:

Neurocognitive disorders (see 112.00B1), for children age 3 to attainment of age 18, satisfied by A and B, or A and C:

A. Medical documentation of a clinically significant deviation in normal cognitive development or by significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:

1. Complex attention;

2. Executive function;

3. Learning and memory;

4. Language;

5. Perceptual-motor; or

6. Social cognition.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):

1. Understand, remember, or apply information (see 112.00E1).

2. Interact with others (see 112.00E2).

3. Concentrate, persist, or maintain pace (see 112.00E3).

4. Adapt or manage oneself (see 112.00E4).

OR

17

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 112.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 112.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02. Listing 112.08 contains the following requirements:

Personality and impulse-control disorders (see 112.00B7), for children age 3 to attainment of age 18, satisfied by A and B:

A. Medical documentation of a pervasive pattern of one or more of the following:

1. Distrust and suspiciousness of others;

2. Detachment from social relationships;

3. Disregard for and violation of the rights of others;

4. Instability of interpersonal relationships;

5. Excessive emotionality and attention seeking;

6. Feelings of inadequacy;

7. Excessive need to be taken care of;

8. Preoccupation with perfectionism and orderliness; or

9. Recurrent, impulsive, aggressive behavioral outbursts.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):

1. Understand, remember, or apply information (see 112.00E1).

2. Interact with others (see 112.00E2).

3. Concentrate, persist, or maintain pace (see 112.00E3).

4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.08.  Finally, the criteria for listing 112.11 provides as

follows:

Neurodevelopmental disorders (see 112.00B9), for children age 3 to attainment of age 18, satisfied by A and B:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

1. One or both of the following:

a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or

b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

2. Significant difficulties learning and using academic skills; or

3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):

1. Understand, remember, or apply information (see 112.00E1).

2. Interact with others (see 112.00E2).

3. Concentrate, persist, or maintain pace (see 112.00E3).

4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11.

19

The undersigned notes that the ALJ did not immediately go into great detail as to why he concluded that D.J.'s impairments did not meet or medically equal a listed impairment, stating only that "[t]he medical evidence does not document listing-level severity, and no acceptable medical source mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (R. at 26.) The ALJ then directs the reader to his functional equivalence analysis, averring that it "embodied" the necessary evidence to support his decision with respect to whether D.J.'s impairments met or medically equaled a listed impairment. (R. at 26.)

Such action is not per se error as long as "the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three." Reavis v. Colvin, No. 3:13-cv-149, 2014 WL 546106, at *20 (E.D. Va. Feb. 10, 2014) (adopting magistrate judge's report and recommendation); see also Russell v. Chater, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished table opinion) (noting that the ALJ is not held to "an inflexible rule requiring an exhaustive point-by-point discussion in all cases"). Thus, the undersigned must determine whether the ALJ's opinion in its entirety provides a sufficient basis to support the ALJ's conclusion that D.J.'s impairments did not meet or medically equal a listed impairment.

In this case, the ALJ should have provided an explanation as to why D.J.'s impairments failed to satisfy the criteria of listing 103.03. Unlike the neurological listings, which are generally based on criteria related to the claimant's functioning, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.02, 112.08, 112.11, listing 103.03's criteria is very precise and centered on the necessity of hospitalization due to the impairment, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03. Accordingly, it does not suffice to merely rely on the functional equivalence assessment for this particular listing unless that assessment also clearly demonstrates that the claimant's impairments

did not satisfy the listing's criteria.  See Huntington v. Apfel, 101 F. Supp. 2d 384, 390 (D. Md. 2000) ("In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met." (citing Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986))).  Here, the ALJ mentioned that D.J. "had not been sent home from school during the current year for asthma complications," (R. at 28), but that does not answer the question whether listing 103.03's criteria is satisfied.  Instead, the ALJ must determine whether the record demonstrates that the claimant's asthma was so severe that it required at least three hospitalizations – at least forty-eight hours in length and at least thirty days apart – within a twelve-month period.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03.  The ALJ did not do that here.

Nonetheless, to the extent the ALJ erred in failing to discuss specifically whether D.J.'s impairments satisfied 103.03's criteria, such error is harmless.  If the ALJ commits an error, for example by erroneously considering or failing to consider certain evidence or by failing to adequately explain his decision, "remand is not appropriate unless the claimant was prejudiced." Dyrdra v. Colvin, 47 F. Supp. 3d 318, 326 (M.D.N.C. 2014) (citing Morgan v. Barnhart, 142 F. App'x 716, 724-25 (4th Cir. 2005)).  Here, Johnson cannot demonstrate prejudice because none of the medical evidence in the record demonstrates that D.J.'s asthma satisfied listing 103.03's criteria.  Although the record shows that D.J. treated with medical professionals for asthma on a few occasions, including trips to the emergency room, none of the treatment notes for those visits reveal that he was ever hospitalized for asthma in accordance with listing 103.03's criteria.  (R. at 370-409, 414-21, 425-27, 437-45, 452-71, 557-59, 674-95.)  Instead, the record reflects that D.J. demonstrated poor compliance with taking his asthma medication as directed – and that when he took the medication as directed, it proved effective in controlling his asthmatic symptoms.  (R. at

373, 437, 440, 690-92.)  Moreover, Johnson testified at the ALJ hearing that D.J. had not been sent home from school due to his asthma during that school year, nor had he gone to the emergency room in the past twelve months for asthma-related symptoms.  (R. at 84.)

In addition, the state agency medical consultants and Dr. Block considered listing 103.03 when assessing D.J.'s impairments and concluded that the criteria was not satisfied.  (R. at 120-21, 133-34, 1376.)  Accordingly, even if the ALJ erred with respect to listing 103.03, the record clearly demonstrates that D.J. did not meet or medically equal that particular listing.  Johnson's pleadings on his behalf do not argue otherwise.

With respect to the neurological listings – 112.02, 112.08, and 112.11 – the undersigned concludes that the ALJ's reliance on his functional equivalence analysis for his finding that D.J.'s impairments did not meet or medically equal one of those listings is adequate to support the step three analysis.  Specifically, as illustrated below, the evidence that the ALJ relied on in the functional equivalence portion of his opinion is the same evidence relevant to whether D.J.'s neurological impairments satisfy any of the listings' criteria.  Accordingly, the undersigned now turns to that portion of the ALJ's opinion.

The ALJ began his functional equivalence assessment by making several observations. First, he stated that he had considered the objective medical evidence in the record and all other relevant evidence from multiple sources, including D.J.'s relatives and teachers.  (R. at 26-27.)  He then noted that he had evaluated how D.J. "functions in all settings and at all times, as compared to other children the same age who do not have impairments."  (R. at 27.)  And he clarified that he had "assessed the interactive and cumulative effects" of all of D.J.'s medically determinable impairments, including non-severe impairments.  (R. at 27.)  The ALJ then observed that although D.J.'s impairments could reasonably be expected to produce the alleged symptoms, "the statements

22

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 27.)

After discussing supporting evidence, (R. at 27-28), the ALJ expressly referenced the opinions of the state agency medical consultants and Dr. Block, all of which found that D.J.'s impairments did not functionally equal a listed impairment, (R. at 28, 116-39, 1374-81). Specifically, Dr. Block determined that D.J. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting with others, caring for himself, and health and physical well-being, and no limitation in moving about and manipulating objects. (R. at 1379-80.) The ALJ accorded substantial weight to Dr. Block's opinion, disagreeing only with respect to the domain of moving about and manipulating objects; the ALJ concluded that D.J. did in fact have limitation – though less than marked – in that domain. (R. at 28, 33-34.)

The state agency medical consultants concluded that D.J. had less than marked limitation in attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being, and no limitation in acquiring and using information and moving about and manipulating objects. (R. at 121-22, 134-35.) The ALJ granted these opinions moderate weight because he concluded that the record established that D.J.'s impairments (less than markedly) limited his ability in the domains of acquiring and using information and moving about and manipulating objects. (R. at 28-30, 33-34.) The ALJ then turned to the individual domains.

1.   Acquiring and Using Information[8]

The Social Security Administration is required to "consider how well [a claimant] acquire[s] or learn[s] information, and how well [a claimant] use[s] the information" he has learned. 20 C.F.R. § 416.926a(g). A typical preschool child "should begin to learn and use the skills that will help [one] to read and write and do arithmetic when [he] is older." § 416.926a(g)(2)(iii). Such skills, referred to as "readiness skills" involve listening to stories, rhyming words, matching letters, counting, sorting shapes, coloring, copying shapes, and using scissors. § 416.926a(g)(2)(iii). In addition, the child should "use words to ask questions, give answers, follow directions, describe things, explain what [he] mean[s], and tell stories." § 416.926a(g)(2)(iii).

A healthy school-age child "should be able to learn to read, write, and do math, and discuss history and science." § 416.926a(g)(2)(iv). He should also be able to use these skills in an academic situation to demonstrate what he has learned, such as by reading and producing oral and written projects, by working in a group, by entering into class discussions, and by working through mathematical problems. § 416.926a(g)(2)(iv). Outside of school, the child should be able to use these skills in daily living situations, such as by reading street signs, telling time, making change, exchanging information and ideas with others, asking questions, and expressing himself. § 416.926a(g)(2)(iv).

Examples that could suggest limitation in this domain include inability to demonstrate understanding of words about space, size, or time; inability to rhyme words; difficulty recalling

---

[8] This domain closely tracks the "understand, remember, or apply information" B criterion of listings 112.02, 112.08, and 112.11. Cf. S.T. by Taylor v. Berryhill, No. 2:16-cv-717, 2017 WL 6945185, at *10 n.11 (E.D. Va. Dec. 21, 2017), R. & R. adopted, 2018 WL 406252 (E.D. Va. Jan. 12, 2018).

important things learned in school the day before; difficulty solving mathematics questions; speaking only in short, simple sentences; and difficulty in explaining what the child means. § 416.926a(g)(3).

In determining that D.J. suffered from less than marked limitation in this domain, the ALJ noted Johnson's statements that D.J. had no problem understanding and applying what he had learned. (R. at 30.) And although D.J.'s pre-kindergarten teacher, Ms. Choate, reported that D.J. had a serious problem applying problem solving skills in class discussions, (R. at 30, 224), school records from D.J.'s kindergarten year demonstrate that D.J. progressed in reading and written expression and was on grade level for reading performance, math, science, and social studies, (R. at 30, 336, 625-26). In addition, the state agency medical consultants found that D.J. had no limitation in this domain, (R. at 121, 134), and Dr. Block found that D.J. had less than marked limitation in this domain, (R. at 1379). Johnson has not identified any contrary medical evidence in her filings. Accordingly, substantial evidence in the record supports the ALJ's decision that D.J. had less than marked limitation in the domain of acquiring and using information.

2.   Attending and Completing Tasks[9]

This domain involves a claimant's ability to focus and maintain attention and his ability to "begin, carry through, and finish [his] activities, including the pace at which" such activities are performed and how changes to the same are handled. § 416.926a(h). A healthy preschool child "should be able to pay attention when . . . spoken to directly, sustain attention to . . . play and learning activities, and concentrate on activities like putting puzzles together or completing art projects." § 416.926a(h)(2)(iii). In addition, the child should have the ability to focus long enough

---

[9] This domain closely tracks the "concentrate, persist, or maintain pace" B criterion of listings 112.02, 112.08, and 112.11. Cf. S.T. by Taylor, 2017 WL 6945185, at *11 n.13.

to carry out tasks independently, such as dressing and feeding himself and putting away his toys. § 416.926a(h)(2)(iii). Lastly, he should generally have the ability to wait his turn and transition between activities when instructed by a teacher or caregiver. § 416.926a(h)(2)(iii).

A typical school-age child "should be able to focus [his] attention," follow instructions, organize his school work, and complete assignments. § 416.926a(h)(2)(iv). He should also be able to focus on details and avoid careless mistakes avoided by others of his age, change his activities or routines, and stay on task and in place when appropriate. § 416.926a(h)(2)(iv). Finally, he should be able to transition between events and activities and sustain his attention sufficiently to read by himself, complete family chores, and participate in group sports. § 416.926a(h)(2)(iv).

Examples that could suggest limitation in this domain include the following: the child is easily startled, distracted, or overreactive to sounds, sights, movements, or touch; the child is slow to focus on, or fail to complete activities of interest to him; the child repeatedly becomes sidetracked from his activities or frequently interrupts others; the child is easily frustrated and gives up on tasks, including ones he is capable of completing; and the child requires extra supervision to keep him engaged in an activity. § 416.926a(h)(3).

For this domain, the ALJ first cited Johnson's statement that D.J. could remain on task for no longer than fifteen minutes. (R. at 31, 220, 267.) Next, the ALJ noted that D.J.'s pre-kindergarten teacher, Ms. Choate, found that D.J had an obvious problem waiting his turn and carrying out single and multi-step tasks; a serious problem refocusing to task; and a very serious problem paying attention when spoken to, transitioning between activities, and working without districting others. (R. at 31, 225.) Finally, the ALJ pointed out that D.J.'s first grade teacher, Ms.

Dupuis, recorded that D.J. required shortened assignments and extra time to complete schoolwork. (R. at 31, 358.)

As the foregoing record demonstrates, D.J.'s impairments in this domain appear to be the most serious. In his discussion of this domain, the ALJ did not cite any evidence in the record that cuts against a finding of limitation, instead summarizing the evidence by imposing a limitation – but one that was less than marked. It is not required that, in order for the court to affirm the ALJ's decision in this respect, the ALJ must have relied on evidence that suggests no limitation; rather, the ALJ's decision must rest on substantial evidence showing "less than marked" limitation. Reviewing the evidence that the ALJ cited in this section of his opinion, in combination with the ALJ's earlier express reliance on the state agency consultants' and Dr. Block's opinions that D.J. had less than marked limitation in this domain, see McCartney v. Apfel, 28 F. App'x 277, 279 (4th Cir. 2002) (noting that "the ALJ need only review medical evidence once in his decision"), the undersigned concludes that substantial evidence supports the ALJ's decision with respect to this domain.

However, to the extent the ALJ erred in failing to provide sufficient evidence in support of his conclusion with regard to this domain, the undersigned believes that error to be harmless. Even if the record demonstrates that D.J. had marked limitation in this domain, a finding that D.J.'s impairments functionally equal a listed impairment would still require a finding of marked limitation in at least one other domain, see 20 C.F.R. § 416.926a(a), which is not present here. See Gainey ex rel. J.G. v. Berryhill, No. 3:15-cv-634, 2017 WL 3315271, at *6-8 (W.D.N.C. Aug. 3, 2017) (agreeing with magistrate judge's recommendation that ALJ's error in failing to consider a particular piece of evidence was harmless because consideration of that evidence "could have at most resulted in a finding of marked limitation in only one domain, which would fall short of

27

marked limitation in two domains required for a determination" of disability); Brown ex rel. A.W. v. Comm'r of Soc. Sec., No. SAG-12-52, 2013 WL 823371, at *3 (D. Md. Mar. 5, 2013) (noting that even if the ALJ erred in finding less than marked limitation, as opposed to marked limitation, in one domain, "absent a marked limitation in another domain, the ALJ's finding of 'no disability' would stand" (citing Shinseki v. Sanders, 556 U.S. 396, 409-11 (2009))).  Furthermore, Johnson does not argue, and the record does not suggest, that D.J. has extreme limitation in this domain. Thus, even if the record establishes that D.J. has marked limitation in this domain, it would not change the ALJ's ultimate conclusion of no disability.

3.    Interacting and Relating with Others[10]

This domain deals with a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."  § 416.926a(i). An average preschool child with no impairments should possess the ability to socialize with both children and adults.  § 416.926a(i)(2)(iii).  The child should prefer playing and making friends with children his own age and should be able to play cooperatively, including taking turns and sharing.  § 416.926a(i)(2)(iii).  In addition, the child should be able to use words, not actions, to express himself, and he should show affection and offer to help others.   § 416.926a(i)(2)(iii). Lastly, the child "should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough" for listeners to understand. § 416.926a(i)(2)(iii).

---

[10] This domain closely tracks the "interact with others" B criterion of listings 112.02, 112.08, and 112.11.  Cf. S.T. by Taylor, 2017 WL 6945185, at *13 n.17.

28

A typical school-age child should be able to form durable friendships with one or more of his peers; learn how to work with others on projects and problem solving; better understand the points of view of others and accept differences; and talk with, tell stories to, and speak with others of all ages in a manner that can be readily understood. § 416.926a(i)(2)(iv).

Examples that could suggest limited functioning in this domain include not reaching out to be picked up and held by a caregiver; having no close friends, especially friends the child's own age; difficulty playing games with rules; avoiding or withdrawing from people the child knows; being overly anxious or fearful of meeting new people or trying new experiences; difficulty communicating with others; and difficulty speaking intelligibly or with adequate fluency. § 416.926a(i)(3).

For this domain, the ALJ discussed Johnson's statement that D.J. was aggressive towards his peers and teachers. (R. at 32, 266.) He also discussed D.J.'s pre-kindergarten teacher's questionnaire regarding D.J.'s performance in the classroom. (R. at 32, 226-27.) Ms. Choate reported that D.J. had an obvious problem making friends, playing cooperatively, and maintaining conversation; and a very serious problem seeking attention, expressing anger, following rules, and obeying authority. (R. at 32, 226.) She also noted that D.J. did not like to be told what to do and will become angry and violent when he does not get his way. (R. at 32, 226-27.) The ALJ also pointed out that D.J. had been reprimanded at school for using foul language, for shoving classmates, and for other outbursts of defiant behavior. (R. at 32, 757, 813, 835, 862, 883-84, 985, 995.) D.J. reported that he had overheard foul language and had witnessed adults engage in physical altercations at home. (R. at 883-84, 907-08, 995.)

However, the ALJ also cited evidence in the record that D.J. appeared to understand that his defiant behavior and use of foul language was inappropriate, as demonstrated by his own

statements on multiple occasions. (R. at 32-33, 757, 760, 767, 784, 787, 795, 806, 813, 821, 835, 862, 881-82.) In addition, counseling notes recorded instances in which D.J. acted appropriately with his peers; shared puzzle pieces and other materials with others; patiently waited his turn while using the computer; and cleaned up his materials and sat on the carpet when instructed. (R. at 32, 739, 743, 746, 749, 833.) The notes also demonstrate that D.J. was receptive to encouragement to follow directions; complied when instructed to keep his hands to himself; and was encouraged to behave appropriately by the use of a sticker chart. (R. 32, 739, 741, 743, 746, 749, 755, 757, 833.) Ms. Choate also described D.J. as "a sweet boy and a great helper." (R. at 32, 625.) In addition, aside from the counseling notes, the state agency medical consultants and Dr. Block opined that D.J. had less than marked limitation in this domain. (R. at 121-22, 134, 1379.)

Although the record contains conflicting evidence with regard to this domain, the court's role is not to reweigh conflicting evidence, Craig, 76 F.3d at 589, but to affirm if the Commissioner's decision is supported by substantial evidence, Perales, 402 U.S. at 390. As with the other domains, the undersigned is satisfied that the ALJ's finding of less than marked limitation in this domain is supported by substantial evidence.

4.   Moving About and Manipulating Objects[11]

This domain considers how well a child moves his body from place to place and how the child moves and manipulates objects – the child's gross and fine motor skills. § 416.926a(j). A typical preschool child should be able to easily walk and run. § 416.926a(j)(2)(iii). The child should be able to climb stairs and playground equipment with little supervision. § 416.926a(j)(2)(iii). In addition, the child should be able to easily complete puzzles and use

---

[11] This domain closely tracks the "adapt and manage oneself" B criterion of listings 112.02, 112.08, and 112.11. Cf. S.T. by Taylor, 2017 WL 6945185, at *15 n.18.

building blocks to construct structures.   § 416.926a(j)(2)(iii).   Finally, the child "should be showing increasing control of crayons, markers, and small pieces in board games, and should be able to cut with scissors independently and manipulate buttons and other fasteners." § 416.926a(j)(2)(iii).

A school-age child without any impairments should be able to move at an efficient pace throughout his school, home, and neighborhood.   § 416.926a(j)(2)(iv).   The child's increasing strength and coordination should increase his ability to enjoy a variety of physical activities, and his fine motor skills should enable him to use many kitchen and household tools independently. § 416.926a(j)(2)(iv).

Examples that could suggest limited functioning in this domain include experiencing muscle weakness, joint stiffness, or sensory loss that interferes with motor activities; trouble using stairs; poor balance; difficulty with activities such as running, jumping, bending, kneeling, crawling, or riding a bike; difficulty sequencing hand or finger movements; difficulty gripping or grasping objects; and poor hand-eye coordination while using a pencil or scissors. § 416.926a(j)(3).

In determining that D.J. had less than marked limitation in this domain, the ALJ considered Johnson's statement that D.J.'s asthma occasionally affected his ability to run around and play outside. (R. at 33, 266.) However, the ALJ also noted that Johnson stated that D.J. could engage in activities after taking his asthma medication.  (R. at 33-34, 82-84.)  In addition, the ALJ considered the opinions of the state agency medical consultants and Dr. Block, which concluded that D.J. had no limitation in this domain. (R. at 122, 134-35, 1380.) Johnson has pointed to no evidence in the record, and the undersigned can find none, that contradicts the ALJ's conclusion

31

with respect to this domain.  Accordingly, substantial evidence in the record supports the ALJ's finding of less than marked limitation in this domain.

5.    <u>Caring for Yourself</u>

This domain considers how well a child can maintain a healthy emotional and physical state, including how well the child gets his physical and emotional wants and needs met in appropriate ways, how the child copes with stress and environmental changes, and whether the child takes care of his own health, possessions, and living area. § 416.926a(k). A typical preschool child should generally desire to independently care for his physical needs, like putting on shoes and getting a snack, and seek to attempt certain activities that he cannot independently perform, such as tying his shoes and taking a bath. § 416.926a(k)(2)(iii). The regulations also provide that a typical child may find it easy to follow caregiver's instructions initially but later find it difficult because the child "want[s] to do things [his] way or not at all." § 416.926a(k)(2)(iii). Finally, the child should be begin recognizing and responding appropriately to certain activities that are not good for the child, such as crossing the street without an adult. § 416.926a(k)(2)(iii).

A healthy school-age child should be independent in day-to-day activities, such as dressing or bathing himself, though he may still need occasional reminding to do these things. § 416.926a(k)(2)(iv). The child should be able to identify those situations where he feels good about himself and those where he feels bad. § 416.926a(k)(2)(iv). He should also begin to develop an understanding of right and wrong and of acceptable and unacceptable behavior. § 416.926a(k)(2)(iv). Finally, the child should start to demonstrate consistent behavioral control and avoid unsafe or unwise behavior. § 416.926a(k)(2)(iv).

Examples that could suggest limited functioning in this domain include the following: the child continues to place inedible objects in his mouth; the child uses self-soothing activities that

32

show developmental regression, like thumb-sucking; the child exhibits restrictive or stereotyped mannerisms, like body-rocking or head-banging; the child is unable to dress or bathe himself appropriately in light of his age; the child engages in self-injurious behavior or ignores safety rules; the child does not spontaneously pursue enjoyable activities or interests; and the child has disturbance in eating or sleeping patterns. § 416.926a(k)(3).

Here, the ALJ cited Johnson's statements that D.J. could dress himself but could not bathe or brush his teeth without help and that D.J. did not put his toys away. (R. at 35, 267.) Next, the ALJ discussed D.J.'s pre-kindergarten teacher's questionnaire, which stated that D.J. had a serious problem being patient, calming himself, and using appropriate coping skills; and a very serious problem handling frustration appropriately, using good judgment, and asserting emotional needs. (R. at 35, 229.)

However, the ALJ also pointed out that during a November 2015 visit with Dr. Dozier, Johnson reported that D.J.'s "ability to self-regulate and calm himself improved." (R. at 35, 569.) The ALJ then provided an example from D.J.'s counseling notes: one day during school, D.J. stated that "sometimes I get mad in school and it makes me not follow the rules," but the following day, D.J. "gained understanding of coping skills, indicating he would like to color a picture when he became upset." (R. at 35, 767, 769.) Moreover, the ALJ's above discussion of the record in the domain of interacting and relating with others – that D.J. appeared to understand that his behavior was inappropriate – likewise provides support to his finding of less than marked limitation in this domain. (R. at 31-33, 757, 760, 767, 784, 787, 795, 806, 813, 821, 835, 862, 881-82.) Combined with the opinions of the state agency medical consultants and Dr. Block that D.J. had less than marked limitation in this domain, (R. at 122, 135, 1380), substantial evidence

supports the ALJ's conclusion that D.J. had less than marked limitation in the domain of caring for yourself.

6.    Health and Physical Well-Being

In this domain, the SSA considers the cumulative physical effects of the child's impairments on the child's health and functioning that were not considered in evaluating the child's motor skills. § 416.926a(l). This domain does not address a child's abilities but rather addresses how chronic illnesses, medication, or the need for recurrent treatment may impact a child's health and physical well-being. § 416.926a(l).

Examples that could suggest limited functioning in this domain include generalized symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints related to impairments such as seizures, headaches, allergies, nausea, or insomnia; limitations in physical functioning because of the child's treatment of his impairments, such as multiple surgeries and nebulizer treatments; exacerbations from one impairment or a combination of impairments that interfere with physical functioning; and the need for intensive medical care to maintain the child's level of health and physical well-being. § 416.926a(l)(3).

Substantial evidence in the record supports the ALJ's conclusion of less than marked limitation with respect to this domain. The ALJ noted that D.J. suffers from asthma, but he also pointed out that D.J. had been noncompliant with taking his asthma medication. (R. at 35, 373, 437, 690-91.) Moreover, the record demonstrates that D.J.'s "breathing improved when he used his inhaler and nebulizer as prescribed." (R. at 35, 373, 440, 692.) The ALJ also considered D.J.'s craniosynostosis, but, as the record demonstrates, D.J. received two corrective surgeries for this condition. (R. at 35, 87, 330-33, 658.) Though it may be true, as Johnson reports, that D.J. must see a craniofacial surgeon once a year for the rest of his life, these appointments appear to be

34

preventative in nature as they are designed to merely monitor his condition. (R. at 86-87). Johnson has not pointed to anything in the record that indicates that D.J. requires medication for this condition, nor that it significantly affects his functioning.[12]

Johnson also indicated at the ALJ hearing that D.J. will require more surgery in the future, but she did not specify the exact type of surgery, nor direct the court to any evidence in the record to support that statement. (R. at 86-87.) Consequently, the record contains substantial evidence that supports the ALJ's finding of less than marked limitation in this domain.

Because substantial evidence supports the ALJ's decision that D.J. did not have marked limitation in any two domains or extreme limitation in any one domain, the undersigned recommends that the court affirm the Commissioner's decision that D.J.'s impairments did not functionally equal any listed impairment. Furthermore, because the same collective evidence central to this finding also supports the conclusion that D.J.'s impairments did not meet or medically equal listings 112.02, 112.08, and 112.11, the undersigned recommends that the court affirm the Commissioner's finding that D.J.'s impairments did not meet or medically equal any of those listings.[13] Finally, as discussed above, the undersigned concludes that, even if the ALJ erred

---

[12] The record indicates that D.J. occasionally suffers from headaches, apparently as a result of his craniosynostosis. (E.g., R. at 86-87.) Although Johnson testified that he takes Children's Tylenol to treat his headaches, Johnson has not pointed to, and the undersigned cannot find, any medical evidence in the record demonstrating that those headaches materially limit his functioning and would warrant a finding of marked or extreme limitation in this domain.

[13] Specifically, as the first four domains are virtually identical to the B criteria in listings 112.02, 112.08, and 112.11, the same evidence relied upon by the ALJ for the proposition that D.J.'s impairments do not functionally meet a listed impairment warrants the conclusion that his impairments do not satisfy the B criteria for any of those listings. Compare 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.02, 112.08, 112.11, with 20 C.F.R. § 416.926a(g)-(j); see also S.T. by Taylor, 2017 WL 6945185, at *10 n.11, *11 n.13, *13 n.17, *15 n.18 That fact is fatal with respect to listings 112.08 and 112.11. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.08, 112.11. In addition, the undersigned concludes that the same evidence likewise supports the conclusion that D.J.'s impairments do not satisfy the A criteria of listing 112.02 because that evidence illustrates the absence of "[m]edical documentation of a clinically significant deviation in normal

35

in failing to adequately discuss listing 103.03, the record nonetheless contains substantial evidence demonstrating that D.J.'s impairments did not meet or medically equal that listing, rendering such error harmless.

**C.      Evidence Submitted After the ALJ's Decision**

1.      <u>Appeals Council</u>

As described above, in appealing the ALJ's decision to the Appeals Council, she submitted a number of documents, primarily relating to D.J.'s cognitive abilities.  (R. at 7-8, 11-18, 42-73.) Under the Social Security regulations, claimants are permitted "to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." <u>Meyer v. Astrue</u>, 662 F.3d 700, 704 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.968, 404.970(b)).  The Appeals Council, however, will review such evidence if it is "new, material, and relates to the period on or before the date of the hearing decision."[14]   20 C.F.R. § 404.970(a)(5).  "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'"  <u>Meyer</u>, 662 F.3d at 705 (quoting <u>Wilkins v. Sec'y, Dep't of Health & Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991)).  "Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision." <u>Norton v. Astrue</u>, No. X, 2012 WL 2838206, at *5 (E.D. Va. June 21, 2012) (citing <u>Johnson</u>, 434 F.3d at 655-56).

---

cognitive development or by significant cognitive decline from a prior level of functioning in one or more of the cognitive areas" of complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02. Accordingly, D.J.'s impairments do not meet or medically equal that listing either.

[14] The claimant must also provide good cause for not timely submitting or informing the Commissioner about such evidence.  20 C.F.R. § 404.970(b).

In this case, the Appeals Council considered Johnson's additional evidence, (see R. at 7-8, 11-18, 42-73), and determined that such evidence was either not relevant or did not carry a reasonable probability of changing the outcome of the ALJ's decision. (R. at 2.) The undersigned has reviewed this evidence and finds no error in the Appeals Council's decision in this respect. The undersigned first notes that nearly all of the additional evidence appears to have been available to Johnson before the ALJ issued his decision. (R. at 42-43, 48-55, 62-64.) However, she did not submit it to the ALJ for consideration and provided no reason for not doing so, see 20 C.F.R. § 404.970(b) – though it appears that the Appeals Council considered it anyway. Assuming that Johnson nonetheless could demonstrate good cause for not submitting the evidence sooner, the evidence would not entitle D.J. to Appeals Council review under § 404.970(a)(5). Indeed, some of the evidence is duplicative or irrelevant. (R. at 7-8, 65-73.) In addition, the Appeals Council could reasonably find that the rest of the evidence did not appear to suggest any greater limitations than those already illustrated by the evidence in the record before the ALJ. (R. at 11-18, 42-64); see also Meyer, 662 F.3d at 705 ("[N]othing in the Social Security Act or regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review."). And Johnson does not argue otherwise. Thus, the undersigned concludes that the Appeals Council did not err with respect to its characterization of the additional evidence that Johnson submitted on appeal.

2.  Summary Judgment

In addition, as a part of her Motion for Summary Judgment, Johnson included a twelve-page evaluation report from Children's Specialty Group, PLLC, a Children's Hospital of The King's Daughters affiliate. (ECF No. 14.) The report is based off three visits between January and April 2019. (ECF No. 14, at 1.) Accordingly, neither the ALJ nor the Appeals Council had

37

occasion to consider this evidence when reviewing D.J.'s application.  Pursuant to 42 U.S.C. § 405(g), "The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).  Such a remand, commonly referred to as a "sentence six remand," "does not rule in any way as to the correctness of the administrative proceeding." Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).  Instead, the court sends it back to the Commissioner to reconsider the claimant's application in light of new evidence "not available to the claimant at the time of the administrative proceeding."  Id.  To warrant remand under this provision, the evidence, as with new evidence before the Appeals Council, must not be duplicative or cumulative and must demonstrate a reasonable possibility that it would have changed the outcome had it been before the Commissioner at the time of his consideration of the claimant's application.  Finney v. Colvin, 637 F. App'x 711, 715-16 (4th Cir. 2016) (citing Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985)).

The undersigned has reviewed the report and concludes that it is largely cumulative and does not present a reasonable possibility that it would have changed the outcome of the ALJ's decision.  Specifically, the report does not demonstrate any greater limitations than those already identified by the evidence in the record, which the ALJ considered in his decision to deny SSI benefits.  In addition, to the extent it contains new diagnoses or relates to his mental development after May 1, 2018, the date of the ALJ's hearing decision, the report is irrelevant.  See Finney, 637 F. App'x at 715 (observing that the new evidence must be "relevant to the determination of disability at the time the claimant first applied for benefits"); cf. 20 C.F.R. § 404.970 (noting that for the Appeals Council to consider evidence not before the ALJ, the evidence must "relate[] to

38

the period on or before the date of the hearing decision"). Accordingly, the undersigned recommends the court against a sentence six remand.

## V. Conclusion and Recommendation

Although Johnson, as a pro se litigant, is entitled to a liberal construction of her pleadings, she must still point the court to specific aspects of the ALJ's decision with which she takes issue. Otherwise, the court is left to guess the basis of her objections – a task the court is ill-equipped to perform. Here, the ALJ applied the correct law and followed all the proper steps in rendering his opinion. In addition, the undersigned has reviewed the entire record and finds no error or deficiency warranting remand. Instead, the undersigned concludes that the record contains substantial evidence that supports the ALJ's finding of no disability. Furthermore, the undersigned concludes that neither the additional evidence submitted to the Appeals Council on appeal nor the additional evidence submitted to the court on summary judgment would impact that decision. Accordingly, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 15), and DENY Johnson's Motion for Summary Judgement, (ECF No. 12).

## VI. Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6 (a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an additional three (3) days, if service occurs by mail. A party may respond to any other party's

objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
December 23, 2019

40

**Clerk's Mailing Certificate**

A copy of the foregoing Report and Recommendation was mailed this date to:

**D.J. c/o Juanita Johnson**
205 Old Dominion Cir Apt 8
Newport News, Virginia 23608


and an electronic copy was provided to:

**George M. Kelley, III**
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510




Fernando Galindo, Clerk


By _____E. Price_____
                Deputy Clerk


_____12/23/2019_____, 2019